# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Williams*, 2012 IL App (1st) 111145

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket Nos. 1-11-1145, 1-11-2251 cons. |
| Opinion filed | November 27, 2012 |
| Opinion withdrawn | December 11, 2012 |
| Modified opinion filed | December 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of defendant's third and fourth successive postconviction petitions was reversed and the cause was remanded for a determination of whether defendant was entitled to a new hearing pursuant to his claim of actual innocence in his third petition, and if a new hearing is denied, the trial court is directed to hold a new sentencing hearing pursuant to the fourth petition, which alleged that the mandatory life sentence without parole imposed for an offense committed when he was a juvenile violated the eighth amendment. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 94-CR-4431-04; the Hon. Angela Munari Petrone, Judge, presiding. |
| Judgment | Reversed and cause remanded. |

Counsel on Appeal

Michael L. Sklar, P.C. (Michael L. Sklar, of counsel), and Ungaretti & Harris LLP (John Ruskusky, Timothy E. Horton, Maura M. McIntyre, and Brittany A. Smith, of counsel), both of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, William L. Tofenetti, and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Quinn and Connors concurred in the judgment and opinion.

## OPINION

¶ 1     Here we are called upon to determine whether the denial of defendant Carl Williams' petition for an evidentiary hearing to show actual innocence should be reversed. We are also required to determine whether the United States Supreme Court's holding in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), prohibiting mandatory life-without-parole sentences for juveniles should be retroactively applied. We answer yes to both issues.

¶ 2     Defendant appeals the dismissal of two of his successive petitions (third and fourth petitions) for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). In his third petition, which the circuit court reviewed as a second-stage proceeding under the Act, defendant made a claim of actual innocence, and claimed that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that he was arrested without probable cause. The circuit court granted the State's motion to dismiss his third petition. In his motion for leave to file his fourth petition, defendant alleged that his mandatory life sentence is unconstitutional. The circuit court denied him leave to file his fourth petition. At issue is whether defendant has made a substantial showing that his constitutional rights have been violated such that he is entitled to an evidentiary hearing on his claims in his third petition; and whether defendant has satisfied the cause-and-prejudice requirements codified under section 122-1(f) of the Act such that the circuit court erred in denying his motion for leave to file his fourth petition challenging his sentence. 725 ILCS 5/122-1(f) (West 2010).

¶ 3                               JURISDICTION

¶ 4     On March 15, 2011, the circuit court granted the State's motion to dismiss defendant's third petition. Defendant timely appealed on April 12, 2011. On that same day, defendant

sought leave from the circuit court to file his fourth petition, which sought to modify his sentence. On June 28, 2011, the circuit court denied defendant leave to file his fourth petition. Defendant timely appealed on July 28, 2011. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 602, 606(a), and 651. Ill. S. Ct. R. 602 (eff. May 30, 2008); R. 606 (eff. Mar. 20, 2009); R. 651 (eff. Apr. 26, 2012). On August 30, 2011, this court granted defendant's motion to consolidate the appeals under case number 1-11-1145.

¶ 5                                            BACKGROUND

¶ 6        All pertinent factual background concerning defendant's trial and initial appeal is well stated in this court's 1999 opinion. *People v. Williams*, 305 Ill. App. 3d 517 (1999). Pertinent factual background concerning defendant's first three postconviction petitions is well stated in this court's 2009 opinion. *People v. Williams*, 392 Ill. App. 3d 359 (2009). Below, we will discuss relevant facts from defendant's third petition and from this court's 2009 opinion.

¶ 7                                    Defendant's Third Petition

¶ 8        In January of 2008, defendant, represented by counsel, filed a motion for leave to file his third petition. In his third petition, based on new affidavits and facts he obtained, he argued he should be granted leave to file his petition in order to prevent a fundamental miscarriage of justice based on his actual innocence. Specifically, he argued that the newly discovered evidence, *i.e.*, the descriptions of the alleged fifth perpetrator provided by his codefendants in their affidavits, combined with his ex-girlfriend Tameka Johnson's affidavit which provided an alibi for defendant, supported his claim of actual innocence. He also argued that the State withheld exculpatory evidence from him in violation of his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing statements favorable to him from three out of his four codefendants,[1] and that there was insufficient factual justification to support probable cause for his warrantless arrest. Defendant alleged he was not able to discover the new evidence sooner because he was hampered by the difficulties of communicating between prisons, by his codefendants' and his ex-girlfriend's refusals to help him, and because the witness who told the police about defendant's whereabouts, Clinton Taylor, gave the police an alias, *i.e.,* Larry McGee. To support his petition, defendant attached the affidavits of his codefendants Zarice Johnson, Stanley Hamelin, and Scott Chambers; his attorney at trial, Stephen Richards; and his ex-girlfriend Tameka Johnson; his own affidavit; an identity sheet from the Illinois Department of Corrections (IDOC); an affidavit showing his attempts to secure the newly discovered evidence; and the unpublished order denying his second petition.[2]

¶ 9        Codefendant Johnson attested that there were four other perpetrators besides himself

---

[1]According to defendant's third petition, his fourth codefendant, Anthony Brown, refused to provide defendant assistance because he is pursuing his own actual innocence claim.

[2]*People v. Williams*, No. 1-04-2153 (2006) (unpublished order under Supreme Court Rule 23).

involved in the crime for which he was convicted; Hamelin, Brown, Chambers, and a person that he did not know (hereinafter, the fifth person). At the time of the incident, he sat next to the fifth person in the backseat of Brown's car for approximately an hour or two. He described the fifth person's appearance as "very dark skinned, wore a full untrimmed beard, was of slim athletic build and over six feet in height." He remembered the fifth perpetrator's height because "he had much difficulty getting his large body out of the back seat of the *** car" and that "[o]nce out of the car his frame was much taller than I would have stood and I'm 5'9"." Once Johnson was arrested, he was separated from his codefendants and "left in a dark room for what seemed like several hours." He was shown photographs by the police of the other perpetrator. He identified Hamelin, Brown, and Chambers, but was unable to identify the photograph of the alleged fifth perpetrator. Johnson attested, "I repeatedly told the interrogating detectives that the person in the remaining photo was not the tall, dark skinned, bearded man that sat next to me in Brown's car," and that he did not know the person in the photograph. The police "insisted" he was wrong and told him that Hamelin and Chambers had identified the fifth perpetrator as the person shown in the photograph. Johnson also attested that the police hit and slapped him, and at one point hit him with a telephone book. Johnson agreed to sign a confession implicating the alleged fifth perpetrator to end the physical abuse from the police and to protect himself. He insisted that the police did not have the correct fifth perpetrator, but the police and assistant State's Attorney (ASA) told him "it didn't matter because the others had identified him." Johnson also attested that he did not know who "Larry McGee" was, and he was not in the car with him when he was arrested.

¶ 10   Johnson acknowledged that he did receive communications from defendant asking for help, but did not respond "because I didn't want to open up this very painful chapter in my life and I was very bitter about what happened to me." He also doubted that he would be able to help or that defendant's efforts would be successful. He did not agree to help defendant until he met defendant's brother in prison "[s]ometime in 2001 or 2002." Defendant's brother was released, but he did not hear from defendant "for another year or so." He "didn't respond for the same reasons as before." A friend of defendant's eventually contacted him in "early 2006." Johnson informed her that he would not help defendant unless a "professional person" became involved.

¶ 11   Hamelin, in his affidavit, attested that he does not know defendant. The first time he saw defendant was when the police showed him a photograph. He attested that he told the police that he did not know the person in the photograph shown to him. He further stated that the police coerced him into identifying defendant as the fifth perpetrator with threats and physical beatings. Hamelin also attested that the police told him that his accomplices had also identified defendant as the fifth perpetrator. He only agreed to implicate defendant to stop the police from physically abusing him further. Hamelin attested that he described the fifth perpetrator to the police as "a very light skinned man with very long hair who was tall around 6'1-6'3 in height." However, he was told by the police "to forget that and agree that it was [defendant]."

¶ 12   Chambers, in his affidavit, attested that he also did not know the fifth perpetrator. He only knew that the fifth perpetrator was a friend of Brown's, "who was called 'Carl' by Brown." Chambers attested that in the statement he gave to Detective Winstead, he

"described this 'Carl' from my memory as about 6 foot 1 to 6 foot 3 in height, light skinned and with very long hair reaching down to his shoulders." Chambers attested that the police provided him with a photograph of the person whom they thought was the fifth perpetrator. Later he viewed the alleged fifth perpetrator in person. Chambers told the police that the person shown to him in the photograph and in person was not the " 'Carl' " that he described to them. The police then "tried to convince" Chambers that the person in the photograph was the fifth perpetrator. Chambers only agreed to identify defendant as the " 'Carl' " he described as the fifth perpetrator because Detective Turner had told him that his codefendants had already identified defendant and he hoped for special treatment for cooperating. He also attested that he was instructed by Detective Turner not to describe defendant physically when confessing to the ASA. Chambers attested that he had "spent time together" with defendant at Cook County jail while they awaited trial. In his affidavit, he stated "I told [defendant] at that time I felt very badly about falsely identifying him to Detective Turner. I told him that I would try to help him later." He acknowledged that defendant contacted him while he was in prison but attested that "[b]ecause I was moving around so much that I wasn't thinking much about [defendant] and his problems and I did not respond" to defendant's letters.

¶ 13        Stephen Richards, defendant's attorney at trial, attested that he was never advised at the time of trial that defendant's codefendants stated to the police that defendant was not involved in the crimes or that their descriptions of the fifth perpetrator were at odds with defendant's appearance. According to Richards, had he known this information at the time of trial, it "is reasonably likely to have changed the outcome of the trial." Richards acknowledged that defendant's codefendants would most likely have asserted their fifth amendment rights and would not have been available as witnesses, but had he known about their statements to the police, he would have introduced them at trial. Had Taylor/McGee's identity been known to him, he would have obtained a statement from him and "together with the withheld new evidence from Chambers, Hamelin, and Johnson, [would] have argued more forcibly that [defendant's] warrantless arrest was unlawful." He would have also called Taylor/McGee to testify to show that the police had arrested the wrong person. The police provided him with no evidence that could have helped him locate the informant.

¶ 14        Tameka Johnson, defendant's former girlfriend, attested that she was with defendant caring for defendant's mother from the afternoon of January 11, 1994, until the afternoon of January 13, 1994. She stated that "[e]arly in the evening of Thursday, January 13th, in my presence, [defendant] called Erica Wells, another one of [defendant's] friends, at her mother's home. *** [Defendant] drove me back to my mother's house after which I assume he visited Erica Wells." She did not disclose this information earlier because her mother insisted she not do it for fear that she would be implicated in the crime. Although defendant had contacted her over the years to aid him, she refused because of her age and her mother's instructions. She also lost contact with defendant because she did not have a telephone or a "means of transportation." Defendant continued to contact her for aid but she refused because she was busy raising her children, and she feared being "held accountable for not disclosing important evidence." She was also in debt and unemployed and spent eight months in custody and "didn't want to have anything more to do with the police and the courts."

¶ 15        Clinton Taylor, a/k/a Larry McGee, attested that he was arrested with Brown, Johnson,

-5-

and another person. He told the police his name was Larry McGee. He was unaware of the crime in question. Taylor saw Brown being physically beaten by the police. He observed Johnson in a "disheveled condition." The police asked him where Carl could be found, but did not tell him why he had been arrested or why they were looking for Carl. The police threatened him and told him that if he did not lead them to Carl, he would be implicated or charged for the crimes committed by Brown and Johnson. They told him they would let him go if he led them to Carl. The only Carl he knew in the neighborhood was defendant. He attested that he led the police to defendant "to avoid being caught up in what was going on and to avoid the beating that I saw Brown receive." He told the police he had no idea whether or not defendant had any involvement in the crime. The police testimony confirmed this. Shortly after defendant's arrest, he moved away from the neighborhood. A few months later, he moved to Iowa and used his given name, Clinton Taylor.

¶ 16    Defendant attached his IDOC record, a copy of his arrest mug shot, and his own affidavit. His IDOC record shows that as of December 26, 2006, he weighed 174 pounds and was 5 feet, 9 inches tall. Defendant attested that his codefendants "are the principle sources of evidence to exonerate me" and that "the only time I saw my co-defendants were brief passing glances in the police station at the time of our arrest in January, 1994." He did not know his codefendants. He attested that he had made continuous efforts since his conviction to establish his innocence. He stated, "my efforts to contact [codefendants] were repeatedly frustrated by the prison system ***, my inability to obtain professional help despite great efforts, and by the refusal and reluctance of my co-defendants to respond to my efforts once I made contact with them." Defendant then described in detail his numerous efforts to contact Chambers, Hamelin, and Johnson. He stated that when he eventually prepared an affidavit for Chambers, Chambers refused because of "his concern about his own pending post-conviction petition which he did not want to put in jeopardy." Defendant attested that he had difficulty locating Johnson because Johnson had been transferred amongst several prisons. He attached a document that logged his numerous attempts to secure professional representation and his attempts to contact his codefendants. He attested that before giving his confession, he was physically abused by Detective Turner. He was also subject to verbal abuse. He only agreed to sign his statement to the police because he feared for his safety.

¶ 17                                    2009 Opinion

¶ 18    This court, in defendant's 2009 appeal from the circuit court's denial of his petition for leave to file his third petition, held that defendant made a claim of actual innocence based on newly discovered evidence that was noncumulative and material and could potentially change the result upon retrial. *Williams*, 392 Ill. App. 3d at 369-70. Specifically, the affidavits of Zarice Johnson and Taylor/McGee were new, in that "both *** were involved in the crimes and were not heard from before." *Id.* at 369. In regard to materiality, this court held "the attestations of Johnson and Taylor[/McGee] that defendant was not the fifth participant in the crimes and that they identified defendant as the fifth offender under pressure from police are clearly material and have the potential to change the result on retrial." *Id.* This court held that Johnson's and Taylor's affidavits were not cumulative but, rather, "lend credence to Chambers' and Hamelin's similar affidavits stating that they were

pressured to wrongly identify defendant." *Id.* at 369-70. This court rejected the State's argument that *res judicata* and collateral estoppel barred defendant's allegations. *Id.* at 368. In conclusion, this court held that "given the *pro se* status of defendant in his initial two postconviction petitions, the gravity of the offenses in this case and the affidavits attesting to defendant's actual innocence, fundamental fairness requires that defendant's postconviction claims receive full consideration on their merits." *Id.* at 371. Accordingly, the matter was remanded for second-stage proceedings under sections 122-4 through 122-6 of the Post-Conviction Hearing Act (725 ILCS 5/122-4 to 122-6 (West 2006)). *Id.*

¶ 19                    Remand Proceedings on Defendant's Third Petition

¶ 20        On remand, defendant sought and the circuit court allowed him to supplement the affidavits of Zarice Johnson, Stanley Hamelin, Clinton Taylor, Stephen Richards, and himself with statements regarding their willingness to testify in support of defendant's petition and waive their rights against self-incrimination. Identical affidavits were then provided from Zarice Johnson, Stanley Hamelin, Clinton Taylor, Stephen Richards, and defendant.

¶ 21        On June 29, 2010, the State filed a motion to dismiss defendant's third petition in which it argued that defendant failed to meet the requirements of the cause-and-prejudice test by presenting evidence that could have been presented earlier; that defendant's actual innocence claim is not based upon new evidence; that defendant failed to meet the requirements of *Brady*; that defendant's claim of actual innocence is not freestanding; and that defendant's attempt to relitigate his motion to suppress is barred by waiver and *res judicata*. Defendant responded that the State' s motion ignored the rulings of this court and that the State's motion failed to deal with the question before the court, *i.e.*, whether defendant has shown "one or more substantial claims of constitutional infirmity in his arrest, interrogation, or trial that entitle him to a third stage hearing on those claims." Defendant asserted that he did show that his constitutional claims were substantial and, thus, he was entitled to proceed to a third-stage evidentiary hearing on his petition.

¶ 22        After briefing and argument, the circuit court granted the State's motion to dismiss defendant's third petition. The circuit court found that the affidavits of Stanley Hamelin, Zarice Johnson, and Scott Chambers were not from new witnesses that had new information. Rather, the affiants were known to defendant at the time of his trial and awaited trial in the same Cook County jail. The circuit court noted that Chambers and Hamelin also gave affidavits in defendant's previous postconviction petition. The circuit court stressed that none of defendant's codefendants in their respective affidavits "identify the availability of the alleged evidence because in none of them does a co-defendant affirmatively aver that he would have waived his right against self-incrimination and testified as to the contents of the affidavits at [defendant's] trial." The circuit court found that Taylor/McGee's affidavit could have been discovered sooner through due diligence as he was known to and was a friend of defendant. The court stated that "[i]t appears that [defendant] made a strategic decision not to call McGee at trial so petitioner could argue that McGee, and not [defendant], was the fifth offender."

¶ 23    In regard to the issue of the police having probable cause to arrest defendant, the court found the issue had previously been ruled upon and, thus, was waived under the doctrine of *res judicata*. The circuit court found that the information in Tameka Johnson's affidavit could also have been known to defendant, as she was his former girlfriend and "[h]er alibi testimony would have been known to [defendant] at the time of trial." As to defendant's *Brady* claim, that the State intentionally withheld evidence of misidentification of him by codefendant Scott Chambers, the circuit court found this information not to be newly discovered because Scott Chambers, in his affidavit, told defendant while they were both awaiting trial that he falsely identified him to the police.

¶ 24    The circuit court also noted that "Zarice Johnson, Scott Chamber, and Stanley Hamelin contradict themselves regarding purported descriptions of the fifth offender given to police. Zarice Johnson described him as very dark skinned with a full, untrimmed beard, Stanley Hamelin described him as very light skinned with very long hair, and Scott Chambers described him as light skinned with very long hair reaching down to his shoulders." The court found that "[t]heir contradictory affidavits give no credence to the notion that their testimony would be of such conclusive character as to probably change the results upon retrial."

¶ 25    The circuit court addressed defendant's allegations of police abuse toward him by finding them waived because they were already made in his motion to suppress statements. The court then explained defendant's confession, which it found "contained details only an attacker would know." The court concluded that it "did not find that the affidavits contain evidence that is material, noncumulative, and could not have been discovered sooner through due diligence. The evidence is not newly discovered, nor of such conclusive character that it would probably change the result on retrial. There has been no showing of a violation of petitioner's constitutional rights." Defendant timely appealed on April 12, 2011.

¶ 26                            Defendant's Fourth Petition

¶ 27    Also on April 12, 2011, defendant filed a motion for leave to file another successive postconviction petition (fourth petition). In his fourth petition, defendant argued that based on the Supreme Court's decision in *Graham v. Florida*, 560 U.S. ___, 130 S. Ct. 2011 (2010), "a sentence of life imprisonment without parole for a non-capital crime committed by a minor was a 'cruel and unusual punishment' and violated the 8th amendment to the Constitution." Defendant cited factors to consider in favor of reducing his sentence, including that he was 17 years old at the time of the offenses, he was convicted on a theory of accountability, and that "if involved at all, [he was not] present when the double murders which invoked the mandatory life sentence were committed later in the crime spree."

¶ 28    On June 28, 2011, the circuit court denied defendant leave to file his fourth petition and assessed fees and costs for filing a frivolous pleading. In its written order, the circuit court found *Graham* distinguishable and that defendant did not meet the cause-and-prejudice test. The court also assessed defendant fees and costs, finding defendant's claim was "frivolous and patently without merit."

¶ 29    Defendant timely appealed on July 28, 2011. On August 30, 2011, this court granted

defendant's motion to consolidate both of defendant's appeals under case number 1-11-1145.

¶ 30    After the parties filed their respective briefs, the Supreme Court issued its opinion in *Miller v. Alabama*, in which it held a "mandatory life [sentence] without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller v. Alabama*, 567 U.S. at ___, 132 S. Ct. at 2460. Subsequently, defendant filed a motion for leave to submit supplemental authority, arguing that *Miller* has a direct impact on his fourth petition currently before this court. Defendant pointed out that in his fourth petition, he, like the majority opinion in *Miller*, principally relied upon the Supreme Court's prior holdings in *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. ___, 130 S. Ct. 2011, in making his argument that juvenile offenders are less culpable and, thus, less deserving of the harshest punishment than adult offenders. We granted defendant's motion, but allowed the State to file a response.

¶ 31    In response, the State argued that *Miller* "does not categorically prohibit life sentences for juveniles, but rather requires a particular *procedure* before it may be imposed." (Emphasis in original.) The State argued the circuit court, when sentencing defendant, used the proper procedure in this case by considering both evidence in aggravation and mitigation, defendant's age, and his allocation before exercising its discretion in sentencing defendant to life in prison without parole. The State argued further the rule expounded in *Miller* is procedural and not applicable to final convictions such as this one. Accordingly, the State argued that *Miller* cannot be applied retroactively.

¶ 32    We allowed defendant to file a reply to the State's response. In reply, defendant pointed out that he was 17 years old at the time the crimes occurred, and he was sentenced to life in prison without the possibility of parole. He alleged that the statute he was sentenced under provided for a mandatory sentence of natural life and therefore violated both the United States and Illinois Constitutions. Accordingly, he maintains his sentence was void *ab initio* and can be attacked at any time.

¶ 33                            ANALYSIS

¶ 34    Before this court, defendant argues that the circuit court erred in granting the State's motion to dismiss his third petition because he has made a substantial showing of constitutional violations, such that he is entitled to an evidentiary hearing. In the alternative, he argues that the circuit court erred in denying his petition for leave to file a fourth petition because the allegations in his fourth petition contain sufficient allegations to satisfy the cause-and-prejudice requirements of section 122-1(f) of the Act. Therefore, he requests a new sentencing hearing.

¶ 35    The Act allows criminal defendants to challenge their conviction or sentence based on substantial deprivations of their constitutional rights. *People v. Peeples*, 205 Ill. 2d 480, 509 (2002). The filing of only one postconviction petition is contemplated under the Act. *People v. Morgan*, 212 Ill. 2d 148, 153 (2004). A petition under the Act is a collateral proceeding, not an appeal. *People v. Williams*, 209 Ill. 2d 227, 232 (2004). Therefore, *res judicata* bars issues previously decided on appeal. *Id.* at 233. Similarly, issues not raised, even though they could have been raised on appeal, are waived. *Id.* However, a successive petition will be

considered on its merits, and the statutory bar to doing so will be relaxed, in the interest of fundamental fairness. *Id.* In order to have a successive petition considered, a petitioner must satisfy the cause-and-prejudice test. *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). The cause-and-prejudice test is codified by section 122-1(f) of the Act, which states:

"(f) Only one petition may be filed by a petitioner *** without leave of the court. Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2010).

¶ 36 However, a petitioner is excused from the cause-and-prejudice test where petitioner can set forth a claim of actual innocence. *Ortiz*, 235 Ill. 2d at 330. Actual innocence claims based on newly discovered evidence are protected by the due process clause of the Illinois Constitution. *Id.* at 333. Newly discovered evidence is "evidence that was not available at defendant's original trial and that the defendant could not have discovered sooner through diligence." *Morgan*, 212 Ill. 2d at 154. The newly discovered evidence has to also be noncumulative and material. *Id.* "Evidence is considered cumulative when it adds nothing to what was already before the jury." *Ortiz*, 235 Ill. 2d at 335. Further, "it must be of such conclusive character that it would probably change the result on retrial." *Morgan*, 212 Ill. 2d at 154.

¶ 37 A petitioner under the Act is not entitled to an evidentiary hearing. *Peeples*, 205 Ill. 2d at 510. Rather, "[a]n evidentiary hearing is warranted on a post-conviction claim only where the allegations in the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that the constitutional rights of the defendant have been violated." *Id.* "At the motion to dismiss stage in post-conviction proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *People v. Childress*, 191 Ill. 2d 168, 174 (2000); see also *People v. Coleman*, 183 Ill. 2d 366, 382 (1998) ("Therefore, the dismissal of a post-conviction petition is warranted only when the petition's allegations of fact–liberally construed in favor of the petitioner and in light of the original trial record–fail to make a substantial showing of imprisonment in violation of the state or federal constitution."). Our review of the circuit court's dismissal of a petition decided without an evidentiary hearing is *de novo*. *Childress*, 191 Ill. 2d at 174.

¶ 38                                     Defendant's Third Petition

¶ 39 Initially, we reiterate that at this stage in the proceedings, defendant's allegations that are not rebutted by the trial record must be liberally construed in his favor and taken as true. *Childress*, 191 Ill. 2d at 174; *Coleman*, 183 Ill. 2d at 382. Our review of the record shows that defendant's newly discovered evidence and the allegations contained therein, *i.e.*,

affidavits from his codefendants, his attorney, and his ex-girlfriend, were not addressed at trial. Accordingly, they must be taken as true at this stage in the proceedings because they are not rebutted by the trial record. *Childress*, 191 Ill. 2d at 174. With these principles in mind, we must determine whether defendant has made a substantial showing that his constitutional rights have been violated.

¶ 40 In order for defendant to be entitled to an evidentiary hearing on his claims, he must show that his evidence is newly discovered, material, and noncumulative, and that it is "of such conclusive character that it would probably change the result on retrial." *Morgan*, 212 Ill. 2d at 154. Defendant has shown that his evidence is newly discovered because it was not available at his trial and could not have been discovered earlier through diligence. *Morgan*, 212 Ill. 2d at 154 (defining newly discovered as "evidence that was not available at defendant's original trial and that the defendant could not have discovered *** through diligence"). Defendant attested that his codefendants and Tameka Johnson were previously uncooperative. His codefendants and Tameka Johnson stated in their affidavits that they were uncooperative with defendant. He attested to the various difficulties of communicating while in the prison system and attached documentation of his numerous attempts to discover the evidence. Clinton Taylor could not even be located until well after trial. Defendant's attorney also attested that the evidence in question was not known to him at the time of trial. Taking these allegations as true, defendant has shown that the evidence his allegations are based on is newly discovered in that it was not available at the time of his trial nor could he have discovered it through diligence.

¶ 41 Additionally, defendant's allegations are material and noncumulative and probably would have changed the result of his trial. His codefendants attested that they each told the police that the police had the wrong man, that they did not know defendant, and that they gave descriptions of the alleged fifth perpetrator that did not match defendant. Taylor/McGee attested to the circumstances which led the police to defendant. We hold that defendant's allegations are clearly material because they weaken or contradict the State's case against him. This evidence is also noncumulative because it is new and was not previously before the trier of fact. See *Ortiz*, 235 Ill. 2d at 335 ("Evidence is considered cumulative when it adds nothing to what was already before the jury."). The codefendants' telling the police they had the wrong man, that they did not know defendant, and that the descriptions they gave did not match defendant was never before the jury and obviously not cumulative. We further hold that this evidence would also probably have changed the result of defendant's trial. The only evidence linking defendant to the crime was his confession. No one identified defendant as being involved. Police testified that Taylor/McGee told them that he knew defendant's name was Carl but he did not know whether defendant was involved in any way in the crimes. Pursuant to a plea agreement, codefendant Johnson testified for the State at codefendant Brown's trial. Johnson testified consistently with his own confession, explaining what role each of the codefendants played in the vehicular hijacking and sexual assault which took place in his presence prior to the double murder. At no time did Johnson identify defendant as being the "Carl" who participated in the crime. Further, the State did not call Johnson at defendant's trial, which took place six months after Johnson testified against Brown. Defendant's attorney supplied an affidavit in which he explains how he would have

-11-

tried the case had he known about the newly discovered evidence. Namely, he would have introduced the statements of defendant's codefendants. He would have argued that defendant's warrantless arrest was illegal. He would have called Taylor/McGee to testify that the police had the wrong person. Taking these allegations as true, defendant's evidence is new, material, and noncumulative, and probably would have changed the result of defendant's trial. Therefore, we hold that defendant has made a substantial showing of a freestanding claim of actual innocence such that he is entitled to an evidentiary hearing on his allegations in his third petition. Accordingly, we reverse the judgment of the circuit court and remand the matter for an evidentiary hearing on defendant's third petition.

¶ 42                                    Defendant's Fourth Petition

¶ 43    Defendant, in his fourth petition, argues that his mandatory life sentence without parole violates the eighth amendment to the Constitution of the United States and section 11 of article I of the Illinois Constitution. He argues that his sentence is void *ab initio* and can be attacked at any time. Additionally, he maintains that he has satisfied the cause-and-prejudice test under section 122-1(f) of the Act because *Miller* was unknown and unknowable to him as it was only recently issued, and that without that argument, he was prejudiced by being denied his right to due process in his sentencing hearing. In response, the State argues that the circuit court followed the proper procedure and exercised its discretion when it sentenced defendant, that the rule expounded in *Miller* is procedural and not applicable in this case, and that the holding of *Miller* cannot be applied retroactively.

¶ 44    The two juvenile defendants in *Miller* were sentenced to life in prison without the possibility of parole for their respective murder convictions. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. The Supreme Court pointed out that "[i]n neither case did the sentencing authority have any discretion to impose a different punishment. State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate." (Emphasis in original.) *Id.* The Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Id.* The Court noted that its prior decisions of *Graham v. Florida*, 560 U.S. ___, 130 S. Ct. 2011 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005), "establish that children are constitutionally different from adults for purposes of sentencing" due to their "diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464.

¶ 45    In reaching its decision, the Court addressed its concerns with proportionate punishment under the eighth amendment. It stated:

        "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' [Citation.] That right, we have explained, 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" ' to both the offender and the offense. [Citation.] As we noted the last time we considered life-without-parole sentences imposed on

-12-

juveniles, '[t]he concept of proportionality is central to the Eighth Amendment.' [Citation.] And we view that concept less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society." ' [Citation.]" *Id.* at ___, 132 S. Ct. at 2463.

The Court did not ban the sentencing of juveniles to life in prison without parole; rather, it held the mandatory sentencing of juveniles to life without parole violates the eighth amendment and required sentencing courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ___, 132 S. Ct. at 2469. The Court concluded:

> "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without the possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." *Id.* at ___, 132 S. Ct. at 2475.

¶ 46    Simply put, *Miller* holds there cannot be a mandatory sentence of life without parole for homicides committed by juveniles. It can be argued that *Miller* was a procedural change in how life without parole is imposed; that it did not create an absolute prohibition on life-without-parole sentences for juveniles. A life-without-parole sentence passes muster where proper procedures allow the trier of fact to determine if it is an appropriate sentence.

¶ 47    Initially, we reject defendant's contention that his sentence was void *ab initio*. To be considered void *ab initio* under a new constitutional rule, the statute in question has to be rendered facially unconstitutional. *Lucien v. Briley*, 213 Ill. 2d 340, 344 (2004). "A statute is facially unconstitutional if there are no circumstances in which it could be validly applied." *Id.* In this case, defendant was sentenced according to the following statutory scheme:

> "(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
> (1) for first degree murder,
>
> * * *
>
> (c) the court shall sentence the defendant to a term of natural life imprisonment when the death penalty is not imposed if the defendant,
>
> ***
>
> (ii) is a person who, at the time of the commission of the murder, had attained the age of 17 or more and is found guilty of murdering an individual under 12 years of age; *or, irrespective of the defendant's age at the time of the commission of the offense, is found guilty of murdering more than one victim*[.]" (Emphasis added.) 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996).

In this case, with the holding of *Miller* in mind, the statute can be validly applied to adults. Accordingly, there are circumstances in which it can be validly applied. Therefore, it is not

facially unconstitutional.

¶ 48    While we have previously determined that defendant's third postconviction petition may proceed because the defendant has made a substantial showing of a freestanding claim of actual innocence, that standard does not apply to the defendant's fourth petition, which is based on *Miller*. Consequently, we must apply the cause-and-prejudice test under section 122-1(f) of the Act. 725 ILCS 5/122-1(f) (West 2010).

¶ 49    This court has rejected defendant's arguments that new court rulings provide a basis to find "cause" for failure to raise an issue on direct appeal or in an initial postconviction petition. See *People v. Purnell*, 356 Ill. App. 3d 524, 531 (2005) (defendant could not base claim of cause on the fact that *Boclair* had not yet been decided at the time he filed his initial postconviction petition); *People v. Leason*, 352 Ill. App. 3d 450, 455 (2004) (defendant could not claim cause on the fact that *Strain* had not been decided at the time he filed initial petition because legal basis for his claim existed even though precedent did not); *People v. Johnson*, 392 Ill. App. 3d 897, 903 (2009) (rejected defendant's assertion that cause requirement was satisfied because *Whitfield* was decided after his initial postconviction petition was filed).

¶ 50    However, in each of those cases this court based its rejection on the fact that the "legal foundation" for the newly cited cases was laid before the defendant's conviction, or the filing of his initial postconviction petition. We find that the holdings defendant relies upon here, *i.e.*, *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (in supplemental briefing before this court), and *Graham v. Florida*, 560 U.S. ___, 130 S. Ct. 2011 (in his fourth petition), were new rules of criminal procedure which made a substantial change in the law and that the legal foundation for these decisions was not laid before defendant's trial or the filing of his initial postconviction petition. Accordingly, defendant has satisfied the cause element of the cause-and-prejudice test of section 122-1(f) of the Act. 725 ILCS 5/122-1(f) (West 2010) ("Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings ***. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings ***.").

¶ 51    Defendant has satisfied the cause element of the cause-and-prejudice test, but he still must show that he was prejudiced. 725 ILCS 5/122-1(f) (West 2010). In order for defendant to show that he was prejudiced by his failure to raise his claim in his initial postconviction petition that his sentence is unconstitutional, defendant has to demonstrate "that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2010). Defendant can show prejudice if the Supreme Court's decision in *Miller* applies retroactively to his case. To determine whether *Miller* created a new constitutional rule of criminal procedure such that it can be applied retroactively in this case, we look to the standards set forth by the Supreme Court in *Teague v. Lane* and adopted by our supreme court in *People v. Flowers*. *People v. Sanders*, 238 Ill. 2d 391, 400-02 (2010) (citing *Teague v. Lane*, 489 U.S. 288 (1989), and *People v. Flowers*, 138 Ill. 2d 218 (1990)). Our supreme court has explained the *Teague* analysis as such:

"Generally, new rules are not to be applied retroactively to cases on collateral review except in two instances: (1) if the rule places certain kinds of primary, private individual conduct beyond the power of the criminal-law-making authority to proscribe; or (2) if the rule requires the observance of those procedures that are implicit in the concept of ordered liberty." *Id.* at 401.

The second exception is limited to " 'watershed rules of criminal procedure' " and to "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.* (quoting *Teague*, 489 U.S. at 311).

¶ 52    We hold that the Supreme Court's decision in *Miller* should be retroactively applied in this case because it is a rule that "requires the observance of those procedures that are implicit in the concept of ordered liberty." *Id.* The Court in *Miller* explained:

"The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' [Citation.] That right, we have explained, 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" to both the offender and the offense. [Citation.] As we noted the last time we considered life-without-parole sentences imposed on juveniles, '[t]he concept of proportionality is central to the Eighth Amendment.' [Citation.]" *Miller*, 567 U.S. at ___, 132 S. Ct. at 2463.

Accordingly, under the proportionate punishment analysis in *Miller*, defendant was denied a "basic 'precept of justice' " by not receiving any consideration of his age from the circuit court in sentencing. (Internal quotation marks omitted.) *Id*. at ___, 132 S. Ct. at 2463. Further, " '[t]he concept of proportionality is central to the Eighth Amendment.' [Citation.]" *Id.* Applying the rule of *Miller* to the case at bar shows that "the rule requires the observance of procedures that are implicit in the concept of ordered liberty." *Sanders*, 238 Ill. 2d at 401.

¶ 53    A new rule of criminal procedure applies retroactively in those instances where it has made a substantial or substantive change in the law. *Id.* (new rules are to be applied retroactively to " 'watershed rules of criminal procedure' " and "limited to those new procedures without which the likelihood of an accurate conviction is seriously diminished" (citing *Teague*, 489 U.S. at 311)). We find that *Miller* not only changed procedures, but also made a substantial change in the law in holding under the eighth amendment that the government cannot constitutionally apply a mandatory sentence of life without parole for homicides committed by juveniles. Life without parole is justified only where the State shows that it is appropriate and fitting regardless of the defendant's age. We hold that *Miller* is such a " 'watershed rule[ ] of criminal procedure.' " *Id.*

¶ 54    As to retroactive application we note the *Miller* decision involved the robbery and murder cases of Evan Miller and Kuntrell Jackson. Miller was convicted of killing a man in Alabama and Jackson was convicted as an accomplice in an Arkansas robbery resulting in murder. Both were 14 when convicted. It is instructive that the *Miller* companion case, *Jackson v. Hobbs*, arising on collateral review, involved a life-without-parole-sentence heretofore final. Notwithstanding its finality, the Supreme Court of the United States in effect retroactively applied *Miller* and vacated Jackson's sentence. "[O]nce a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively

-15-

to all who are similarly situated." *Teague*, 489 U.S. at 300. The *Miller* case held under the eighth amendment that it is cruel and unusual punishment to impose a mandatory life sentence without parole to a special class–juveniles. It would also be cruel and unusual to apply that principle only to new cases. We therefore hold that the Court's holding in *Miller* should be retroactively applied. From the above discussion, we believe that it is evident that when a defendant has met his burden under *Teague* that a new rule must be retroactively applied, the defendant has also met his burden under the cause-and-prejudice test. 725 ILCS 5/122-1(f) (West 2010); *People v. Pitsonbarger*, 205 Ill. 2d 444, 461-62 (2002).

¶ 55    Before this court the parties each sought leave to cite additional authority, which we allowed. The State cited a recent case from the Florida court of appeals, *Geter v. State*, No. 3D12-1736, 2012 WL 4448860 (Fla. Dist. Ct. App. Sept. 27, 2012); and defendant cited a *per curiam* opinion from the Louisiana Supreme Court in *State v. Simmons*, No. 2011-KP-1810, 2012 WL 4856210 (La. Oct. 12, 2012), and two unpublished decisions, the California Court of Appeals decision in *People v. Hoffman*, No. F061127, 2012 WL 3066392 (Cal. Ct. App. July 30, 2012), and the Iowa Court of Appeals decision in *Iowa v. Lockheart*, 820 N.W.2d 769 (Iowa Ct. App. 2012) (table). We have reviewed all of the supplemental authorities submitted by the parties and find them all distinguishable. Although we agree with the ultimate results of *Simmons*, *Hoffman*, and *Lockheart*, in that they each remand their respective cases for resentencing in accord with *Miller*, none of them employ the *Teague* analysis that we have relied upon in reaching our conclusion. We have also reviewed the *Geter* decision cited by the State. Although we disagree with the result of *Geter* in that it held that *Miller* did not apply retroactively, it also used a different standard of analysis than that found in *Teague*. We acknowledge that the United States Supreme Court held in *Danforth v. Minnesota*, 552 U.S. 264, 280-81 (2008), that state courts need not utilize the analysis found in *Teague*. However, our supreme court still employs it. See *People v. Davis*, 388 Ill. App. 3d 869, 879 (2009) (listing cases). Accordingly, the supplemental authorities from foreign jurisdictions cited by the parties have no effect on our decision to retroactively apply *Miller*.

¶ 56    After oral argument in this matter, the State filed another motion for leave to cite additional authority, which we allowed. In its motion, the State cited the recent Michigan Court of Appeals decision in *People v. Carp*, No. 307758, 2012 WL 5846553 (Mich. Ct. App. Nov. 15, 2012). The *Carp* court held, utilizing a *Teague* analysis, that the holding in *Miller* is not a substantive new rule requiring cases on collateral review to apply it retroactively. The *Carp* court specifically held, contrary to our holding in this case, that *Miller* did not create a watershed rule of criminal procedure. As discussed *supra*, we hold that *Miller* did create such a rule. Therefore, we respectfully disagree with the Michigan Court of Appeals decision in *Carp*.

¶ 57    Here, the sentencing court did not graduate and proportion punishment for defendant's crime considering his status as a juvenile at the time of the offense. This violates the eighth amendment's prohibition on cruel and unusual punishment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. Therefore, defendant has shown prejudice under the Act. 725 ILCS 5/122-1(f) (West 2010) ("Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction petition and prejudice

results from that failure."). Accordingly, defendant has satisfied the cause-and-prejudice test of section 122-1(f) of the Act and the circuit court erred in denying his motion for leave to file a successive postconviction petition. 725 ILCS 5/122-1(f) (West 2010).

¶ 58    At oral argument the State informed the court that approximately 105 convicted defendants in Illinois have life without parole sentences and would be affected if the *Miller* holding is applied retroactively. This is not such a great number of cases for us to conclude that it is an unreasonable burden for the State and the courts to reopen their cases for resentencing.

¶ 59    Lastly, we address a concern which arises as a consequence of determining *Miller* to be retroactively applied. No doubt there are family members, friends, and victims who have suffered due to the acts of juveniles now serving life-without-parole sentences. We understand the anxiety, pain, and negative impact that remanding and ordering resentencing hearings will cause them. However, a new sentencing hearing should require only one further proceeding to attend whether or not they previously attended. They will have another opportunity to make a statement as to the impact the crime has had upon them before the new sentence is given. See 725 ILCS 120/6 (West 2010).

¶ 60    Due to our holding regarding defendant's fourth petition, if the circuit court declines to grant defendant a new trial after an evidentiary hearing on his third petition, the circuit court shall conduct a new sentencing hearing in accord with our holding concerning defendant's fourth petition. Additionally, due to our holding on defendant's fourth petition, we reverse the circuit court's judgment awarding fees and costs.

¶ 61                                    CONCLUSION

¶ 62    The judgment of the circuit court is reversed and the cause is remanded with directions.

¶ 63    Reversed and cause remanded.