# Illinois Official Reports

## Appellate Court

<table>
<tr><td colspan="2"><em>People v. Holman</em>, 2016 IL App (5th) 100587-B</td></tr>
</table>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD HOLMAN, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-10-0587 |
| Filed | March 3, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 80-CF-5; the Hon. Charles V. Romani, Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Ellen J. Curry, and Robert S. Burke, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.<br><br>Thomas D. Gibbons, State's Attorney, of Edwardsville (Patrick Delfino, Stephen E. Norris, and Whitney E. Atkins, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CHAPMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Schwarm and Justice Moore concurred in the judgment and opinion. |

**OPINION**

¶ 1 This appeal requires us to consider whether a natural-life sentence without the possibility of parole may be imposed on a defendant who was a minor at the time of the offense when the sentencing court had the discretion to impose a lesser sentence. The defendant, Richard Holman, was 17 years old when he committed the murder at issue in this case. In April 1981, a court sentenced him to natural life in prison. Since that time, courts have grappled with the question of the extent to which the eighth amendment's proscription against cruel and unusual punishment (U.S. Const., amend. VIII) limits the sentences that may be imposed for crimes committed by juveniles. In *Miller v. Alabama*, the United States Supreme Court held that a mandatory sentence of natural life in prison without the possibility of parole runs afoul of the eighth amendment when imposed for a crime committed when the defendant was a juvenile. *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2469 (2012). In this case, the defendant filed a petition for leave to file a successive postconviction petition alleging that his natural-life sentence is unconstitutional. He appeals an order denying that petition, arguing that (1) the sentencing court did not take into account mitigating factors associated with his youth, as required by the Court in *Miller*, and (2) the holding of *Miller* should be expanded to encompass any natural-life sentence imposed for a crime committed while the defendant was a juvenile. We affirm.

¶ 2 On July 13, 1979, 83-year-old Esther Sepmeyer was found dead in her rural farmhouse. Mrs. Sepmeyer had been shot in the side of the head with her own rifle. Her home had been ransacked. The defendant's fingerprints were found on the cabinet where Mrs. Sepmeyer stored her rifle. The defendant and a codefendant, Girvies Davis, were arrested for the murder. Both gave statements to police. Girvies admitted that he loaded the rifle but indicated that the defendant was the shooter. The defendant indicated that Girvies was the shooter. Although the defendant's fingerprints were the only prints found on the cabinet, the State acknowledged that it could not establish beyond a reasonable doubt which of the two defendants was the shooter. It should be noted that the defendant turned 18 on August 20, 1979, just five weeks after the murder.

¶ 3 A jury found the defendant guilty of first degree murder in March 1981, and the matter proceeded to a sentencing hearing on April 24, 1981. The multiple-murder sentencing statute in effect at the time provided that the court "*may* sentence the defendant to a term of natural life imprisonment" if the defendant has been convicted of murdering more than one person. (Emphasis added.) Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-8-1(a)(1); see also Ill. Rev. Stat. 1979, ch. 38, ¶¶ 1003-3-3(d), 1005-8-1(d) (providing that parole is not available to prisoners serving sentences of natural life). (We note that the statute was subsequently amended to make natural-life sentences mandatory for defendants convicted of more than one murder. See Pub. Act 82-717, § 2 (eff. July 1, 1982) (amending Ill. Rev. Stat. 1981, ch. 38, ¶ 1005-8-1). All of the Illinois cases we will discuss later in this opinion arose under the latter version of the statute.)

¶ 4 A presentence investigation report (PSI) indicated that the defendant had been convicted in two unrelated cases of two additional murders and one attempted murder. One of those cases involved the August 30, 1979, robbery of an auto parts store. The defendant and Girvies, his codefendant in this case, were both convicted of one count of murder and one count of attempted murder. The other case involved the May 11, 1979, murder of John Oertel, during a

home invasion. In addition, the PSI indicated that the defendant had three delinquency adjudications between 1975 and 1978. Two delinquency adjudications were for burglaries; the third involved three counts of criminal damage to property.

¶ 5 The PSI included psychological evaluations of the defendant. Psychiatrist Dr. Syed Raza evaluated the defendant and diagnosed him with borderline or dull normal intelligence, anxiety, and depression. He stated, however, that these diagnoses were tentative because he believed that neurological testing was necessary to exclude neurological issues resulting from a head injury.

¶ 6 Psychologist Cheryl Prost then performed a psychological evaluation. In her evaluation, Prost noted that there were indications of neurological impairment. She found that the defendant had a verbal IQ of 73 and a performance IQ of 64. These scores both fell within the borderline retarded range. Prost also pointed out that the defendant was admitted to the Warren G. Murray Children's Home for a period of six weeks in 1976 when he was 15 years old. Prost noted that, during that time, staff observed that the defendant tended to be a follower and that his low IQ made him susceptible to bad influences from more intelligent peers.

¶ 7 After reviewing Prost's evaluation, Dr. Raza provided an addendum to his evaluation. Dr. Raza noted that although the defendant's overall IQ was toward the lower end of the borderline mentally retarded range, his verbal IQ was high enough to give the defendant the ability to exercise judgment as to the difference between right and wrong. Dr. Raza concluded that the defendant was not "severely handicapped" in terms of his ability to differentiate right from wrong.

¶ 8 The PSI also contained a brief family history as well as the observations of the probation officer who prepared the report, Linda Schulze. In the family history section, Schulze noted that the defendant's father and stepfather both died while he was young. She further noted that the defendant reported to her that he had a close and loving relationship with his mother and siblings. Finally, Schulze noted that the defendant showed no remorse for Mrs. Sepmeyer or for the victims of any of his prior crimes. Schulze thus concluded that the defendant had "no predilection for rehabilitation."

¶ 9 At the sentencing hearing, the State's Attorney highlighted the defendant's criminal history and emphasized the fact that the victim was 83 years old and posed no threat to the defendant. He argued that, given the defendant's history, a sentence of natural life in prison was necessary to protect the public from the defendant. In addition, he argued that such a sentence was necessary to deter others from "going out on similar killing sprees." Defense counsel argued that the question before the court was whether the court "should assess natural life to this very young man." Counsel asked the court to consider rehabilitation as a goal and argued that isolation in the prison system mitigates against that goal.

¶ 10 The court offered the defendant an opportunity to make a statement. The defendant expressed no remorse for his role in the death of Esther Sepmeyer. Instead, he took issue with the prosecutor's argument that he had been convicted of previous murders. He told the court, "I have been convicted as what they say as accessory of the murder, of knowing that this murder [may] have taken place. I was never convicted of no murder."

¶ 11 Before pronouncing sentence, the court stated that it had considered the statutory factors in aggravation and mitigation. The court found no statutory factors in mitigation and stated that there were "many factors in aggravation." The court then stated that it had considered the evidence presented at trial, the PSI, and the evidence and arguments presented at the

sentencing hearing. The court concluded, stating, "And the court believes that this Defendant cannot be rehabilitated and that it is important that society be protected from this Defendant." The court therefore sentenced the defendant to natural life in prison.

¶ 12    The defendant appealed his conviction, but did not challenge his sentence. This court affirmed the defendant's conviction on direct appeal. *People v. Holman*, 115 Ill. App. 3d 60, 66 (1983). Between 2001 and 2009, the defendant filed three petitions for leave to file postconviction petitions. He raised various challenges to his sentence, including claims based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and our supreme court's holding in *People v. Miller*, 202 Ill. 2d 328 (2002) (*Leon Miller*) (holding that a mandatory sentence of life in prison violates the eighth amendment if imposed for a murder committed by a juvenile convicted under a theory of accountability). Each petition was dismissed, and this court upheld those rulings on appeal.

¶ 13    On October 7, 2010, the defendant filed the petition for leave to file a successive postconviction petition that is at issue in this appeal. In his *pro se* petition, he argued that his sentence of natural life in prison violated the constitution. He did not cite the eighth amendment, and he could not cite *Miller v. Alabama*, which had not yet been decided. On November 10, 2010, the circuit court entered an order denying the defendant's petition for leave to file the postconviction petition. The court found that the defendant failed to allege facts to satisfy the cause-and-prejudice test. See 725 ILCS 5/122-1(f) (West 2010); *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002). The defendant appealed that ruling.

¶ 14    The United States Supreme Court issued its decision in *Miller* in June 2012, while this matter was pending on appeal. The defendant argued on appeal that his sentence was unconstitutional pursuant to *Miller*. On December 31, 2012, this court affirmed the trial court's order denying the defendant's petition. We acknowledged that the First District had held that *Miller* applied retroactively to cases on collateral review. *People v. Holman*, 2012 IL App (5th) 100587-U, ¶ 19 (citing *People v. Williams*, 2012 IL App (1st) 111145, ¶¶ 42-56, and *People v. Morfin*, 2012 IL App (1st) 103568, ¶¶ 35-59). However, we found that the defendant forfeited this claim by failing to identify the eighth amendment as the basis for the constitutional claim in his petition. *Id.* ¶ 18. We further found that he failed to satisfy the "cause" portion of the cause-and-prejudice test because the petition did not raise any claims that could not have been raised in earlier proceedings. *Id.* ¶ 16. We thus concluded that the defendant's *Miller* argument was not properly before us. *Id.* ¶ 17. We then noted in *dicta* that *Miller* was not violated because the defendant here was "afforded a 'sentencing hearing where natural life imprisonment [was] not the only available sentence.' " *Id.* ¶ 19 (quoting *Morfin*, 2012 IL App (1st) 103568, ¶ 59).

¶ 15    Subsequently, Illinois courts, including this court, have relaxed the forfeiture rule further than this court was willing to do in the defendant's first appeal. In *People v. Luciano*, a defendant filed a postconviction petition raising several challenges to his conviction. *People v. Luciano*, 2013 IL App (2d) 110792, ¶ 38. He did not challenge the constitutionality of his sentence, however. *Id.* ¶ 46. The trial court dismissed his petition in July 2011, which was nearly a year before the Supreme Court issued its decision in *Miller*. *Id.* ¶ 39. The defendant argued on appeal that his sentence was unconstitutional under *Miller*. *Id.* ¶ 43. The Second District rejected the State's contention that the defendant had forfeited this argument. *Id.* ¶¶ 46-47. The court explained that an unconstitutional sentence is void and may therefore be challenged at any time. *Id.* ¶ 48.

¶ 16    Similarly, in *People v. Johnson*, this court considered an appeal from a trial court order which denied a postconviction petition before the Supreme Court issued its opinion in *Miller*. *People v. Johnson*, 2013 IL App (5th) 110112, ¶ 8. On appeal, the defendant challenged his sentence on the basis of *Miller*, which was decided while the matter was pending on appeal. *Id.* In rejecting the State's forfeiture argument, we first noted that the petition in that case alleged that the defendant's sentence was unconstitutional because it did not " 'reflect *** his ability to be rehabilitated' " and because it was " 'cruel.' " *Id.* ¶ 13. We then stated, "We also note that *Miller v. Alabama* has only been recently decided and to ignore it and its applicability in the instant case would constitute a serious injustice." *Id.*

¶ 17    Most importantly, our decision not to address the merits of the defendant's *Miller* claim was further undermined by the Illinois Supreme Court in *People v. Davis*, 2014 IL 115595, *cert. denied*, 574 U.S. ___, 135 S. Ct. 710 (2014). There, the supreme court addressed the applicability of the cause-and-prejudice test and reached the merits of a *Miller* claim raised in a situation procedurally similar to the case before us. The defendant in *Davis* filed a petition for leave to file a successive postconviction petition. The petition, filed before *Miller* was decided, challenged the defendant's natural-life sentence under the eighth amendment. This argument was based on *Graham v. Florida*, 560 U.S. 48 (2010). *Davis*, 2014 IL 115595, ¶ 9. On appeal, he also argued that the sentence was unconstitutional pursuant to *Miller*. *Id.* ¶ 10. The appellate court applied *Miller* retroactively (*id.*), and the State appealed that ruling to the Illinois Supreme Court (*id.* ¶¶ 11, 22). The supreme court held that *Miller* announced a new substantive rule of constitutional law to be applied retroactively. *Id.* ¶¶ 34-40; see also *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 735 (2016); *Johnson*, 2013 IL App (5th) 110112, ¶ 22.

¶ 18    Significantly for purposes of this appeal, the *Davis* court went on to consider the relevance of *Miller* in applying the cause-and-prejudice test. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)) contemplates that a defendant will file only one petition. *Davis*, 2014 IL 115595, ¶ 14 (citing *Pitsonbarger*, 205 Ill. 2d at 456). With limited exceptions not relevant here, a defendant will not be granted leave to file a successive petition unless he can establish both cause and prejudice for his failure to raise his claims in an earlier petition. *Id.* To establish "cause," a defendant must allege that an "objective factor external to the defense" prevented counsel from raising the claim earlier. *Id.* "Prejudice" means an asserted constitutional error so serious that the resulting conviction or sentence violates due process. *Id.* The *Davis* court explained that "*Miller*'s new substantive rule constitutes 'cause' because it was not available earlier to counsel [citation], and [it] constitutes prejudice because it retroactively applies to [the] defendant's sentencing hearing." *Id.* ¶ 42. The supreme court subsequently directed this court to vacate our previous decision in this case and directed us to consider whether, in light of its holding in *Davis*, a different result was warranted. *People v. Holman*, No. 115597 (Ill. Jan. 28, 2015) (supervisory order).

¶ 19    Upon reconsideration, we find that it is appropriate to address the merits of the defendant's *Miller* claim. Our previous finding that the defendant failed to meet the cause-and-prejudice test is contrary to the supreme court's ruling on that issue in *Davis*. In addition, in light of *Johnson* and *Luciano*, we believe it is appropriate to relax the forfeiture rule and consider the defendant's arguments even though the eighth amendment was not raised in the defendant's *pro se* petition. We now turn to those arguments.

¶ 20      The defendant argues that his sentence of natural life in prison violates the eighth amendment under the Supreme Court's holding in *Miller*. Constitutionality of sentencing schemes is a question of law. Our review, therefore, is *de novo*. *People v. Jones*, 223 Ill. 2d 569, 596 (2006).

¶ 21      The eighth amendment provides that " '[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' " *Graham v. Florida*, 560 U.S. 48, 58 (2010) (quoting U.S. Const., amend. VIII). This prohibition applies not only to forms of punishment that are "inherently barbaric," but also to sentences that are "disproportionate to the crime." *Id*. at 59. The Supreme Court has repeatedly emphasized that the requirement of proportionate sentencing is central to the protection afforded by the eighth amendment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2463; *Graham*, 560 U.S. at 59. This means that sentences must be proportionate to both the offender and to the offense. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2463 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005), quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).

¶ 22      *Miller* was one of a series of United States Supreme Court cases involving the proportionality of sentences imposed for serious crimes committed by juveniles. *Id.* at ___, 132 S. Ct. at 2464-65 (discussing *Graham* and *Roper*). These cases, like other eighth amendment cases, required the Court to consider both the nature of the offense and the characteristics of the offender. *Graham*, 560 U.S. at 60.

¶ 23      In considering the characteristics of young offenders, the Court explained that juveniles "are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. One key distinction is that a juvenile's character is less fully formed and less permanently fixed than that of an adult. Thus, the actions of a juvenile offender are less likely than those of an adult to be the result of irreparable depravity. *Id*. at ___, 132 S. Ct. at 2464 (quoting *Roper*, 543 U.S. at 570). This fact makes the possibility of rehabilitation a particularly appropriate consideration. *Id*. at ___, 132 S. Ct. at 2468. Another important difference between juveniles and adults is that juveniles are more susceptible to negative outside influences, including peer pressure and familial pressure. *Id*. at ___, 132 S. Ct. at 2464 (quoting *Roper*, 543 U.S. at 569). The Court pointed out that a juvenile "cannot usually extricate himself" from a "brutal or dysfunctional" home environment. *Id*. at ___, 132 S. Ct. at 2468. A third critical distinction identified by the Supreme Court is the fact that juveniles are less mature, less responsible, more impulsive, and more likely to take risks than their adult counterparts. *Id*. at ___, 132 S. Ct. at 2464 (quoting *Roper*, 543 U.S. at 569). The Court explained in *Miller* that because of these features, juvenile defendants have both "diminished culpability and [a] heightened capacity for change." *Id*. at ___ , 132 S. Ct. at 2469.

¶ 24      In assessing the nature of the offense, the Court has drawn "a line 'between homicide and other serious violent offenses.' " *Graham*, 560 U.S. at 69 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 438 (2008)). This is because the "Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id*.

¶ 25      Finally, in considering whether a sentence itself is excessive or disproportionate, the Court has generally treated the death penalty differently from prison sentences. In death penalty cases, the Court has held that the eighth amendment requires "certain categorical restrictions." *Id*. at 59. By contrast, cases involving challenges to the proportionality of prison terms have instead required the Court to consider whether the length of the sentence is "grossly

disproportionate" in light of all the circumstances of the particular case. *Id.* at 59-60. Such cases have not generally involved categorical restrictions. See *id.* at 61 (noting that a "categorical challenge to a term[ ]of[ ]years" was a question the Court had not previously considered). However, the Court has recognized that natural life without the possibility of parole is " 'the second most severe penalty permitted by law' " (*id.* at 69 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.))) and that such sentences "share some characteristics with death sentences" (*id.*). In *Graham* and *Miller*, the Court also recognized that a sentence of natural life without the possibility of parole is a harsher sentence when imposed on a juvenile than it is when it is imposed on an adult offender. This is because the juvenile will spend a longer time in prison as a result of this sentence than will an adult offender. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466; *Graham*, 560 U.S. at 70.

¶ 26    Applying these principles in *Graham*, the Supreme Court held the eighth amendment requires a categorical ban on sentences of natural life without the possibility of parole for crimes other than homicide that are committed by juveniles. *Graham*, 560 U.S. at 82. The Court took care to distinguish between homicide and other felonies. *Id.* at 69. The Court explained that "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." *Id.* This holding was therefore limited to nonhomicide cases. *Id.* at 82.

¶ 27    Two years later in *Miller*, the Court considered a challenge to mandatory sentences of natural life in prison imposed for murders committed by juveniles. That case involved appeals by two 14-year-old defendants convicted of murder. Each defendant was sentenced to life in prison without the possibility of parole pursuant to state laws that did not give sentencing courts the discretion to impose any other sentence. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. In determining that these sentences were not sanctioned under the eighth amendment, the Court reaffirmed that "*Graham*'s flat ban on life without parole applied only to nonhomicide crimes." *Id.* at ___, 132 S. Ct. at 2465. However, the Court explained:

"But none of what [the *Graham* Court] said about children–about their distinctive (and transitory) mental traits and environmental vulnerabilities–is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id.* at ___, 132 S. Ct. at 2465.

¶ 28    The Court then explained at length how mandatory sentencing schemes fail to take these features of youth into account. The Court explained:

"Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him–and from which he cannot usually extricate himself–no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth–for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own

attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id*. at ___, 132 S. Ct. at 2468.

In addition, the Court explained that mandatory sentencing schemes are flawed because they do not allow sentencing courts to differentiate between a 17-year-old defendant and a 14-year-old or between a shooter and an accomplice. *Id*. at ___, 132 S. Ct. at 2467-68.

¶ 29 In light of these considerations, the Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id*. at ___, 132 S. Ct. at 2469. The Court stated that this holding would not "foreclose a sentencer's ability" to impose such a sentence in homicide cases. *Id.* at ___, 132 S. Ct. at 2469. The Court noted, however, that "given all [the Court has] said *** about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* at ___, 132 S. Ct. at 2469. The Court further stated that its holding requires sentencing courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at ___, 132 S. Ct. at 2469.

¶ 30 The defendant acknowledges that the sentencing court in this case had the discretion to impose a sentence other than natural life. He argues, however, that his sentence runs afoul of *Miller* for two reasons. First, he argues that the court did not consider certain factors he contends the *Miller* Court required sentencing courts to consider. Second, he argues that, assuming *Miller* did not mandate consideration of set factors, there is no indication in the record that the sentencing court gave any weight to his status as a juvenile. We will consider these arguments in turn.

¶ 31 The defendant first argues that his sentence does not comport with the requirements of *Miller* because the sentencing court did not hold a "*Miller*-type" hearing at which it considered what he refers to as the *Miller* factors. In support of this contention, the defendant cites a South Carolina decision which identified the *Miller* factors as:

> "(1) the chronological age of the offender and the hallmark features of youth, including 'immaturity, impetuosity, and failure to appreciate the risks and consequence'; (2) the 'family and home environment' that surrounded the offender; (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him; (4) the 'incompetencies associated with youth–for example, [the offender's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the offender's] incapacity to assist his own attorneys'; and (5) the 'possibility of rehabilitation.' " *Aiken v. Byars*, 765 S.E.2d 572, 577 (S.C. 2014) (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468).

The defendant points out that the statutory factors in mitigation considered by the sentencing court in this case did not include any of these factors. See Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-5-3.1. As such, he contends, his sentence must be vacated and this cause must be remanded for a new sentencing hearing that fully complies with what he sees as the requirements of *Miller*.

¶ 32 In response, the State acknowledges that the *Miller* Court mandated consideration of the mitigating characteristics of youth. The State, however, contends that although the Court provided an illustrative list of some of those characteristics, it did not mandate consideration of any specific factors. We agree with the State.

- 8 -

¶ 33    We first note that the state courts that have addressed the question of how to apply *Miller* in the context of discretionary natural-life sentences have reached differing conclusions. See *State v. Riley*, 110 A.3d 1205, 1214 n.5 (Conn. 2015) (noting that "there is no clear consensus"). Some courts have found that *Miller* requires consideration of set factors associated with youth, as the South Carolina Supreme Court found in *Aiken*. See, *e.g.*, *id.* at 1216; *People v. Gutierrez*, 324 P.3d 245, 268-69 (Cal. 2014) (describing five factors courts must consider before sentencing juvenile defendants to life in prison without parole); *Bear Cloud v. State*, 2013 WY 18, ¶ 42, 294 P.3d 36 (Wyo. 2013) (setting forth seven factors courts must consider in sentencing juveniles to life in prison without parole (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467-68)). Other courts have concluded that as long as sentencing courts have the discretion to impose sentences other than natural life in prison without the possibility of parole, *Miller* is not violated. See, *e.g.*, *Foster v. State*, 754 S.E.2d 33, 37 (Ga. 2014); *Arredondo v. State*, 406 S.W.3d 300, 307 (Tex. App. 2013).

¶ 34    Still other courts have found that although the *Miller* Court did require sentencing courts to consider mitigating circumstances related to a juvenile defendant's youth, it did not require courts to consider any set list of factors. See, *e.g.*, *State v. Ali*, 855 N.W.2d 235, 257 (Minn. 2014) (explaining that sentencing courts must consider "any mitigating circumstances," including those discussed by the *Miller* Court); *State v. Long*, 138 Ohio St. 3d 478, 2014-Ohio-849, 8 N.E.3d 890, at ¶ 16 (finding that the factors adopted by the Wyoming Supreme Court in *Bear Cloud* "may prove helpful" to courts sentencing juvenile defendants, but refusing to require sentencing courts to make explicit findings with respect to any enumerated factors); *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (holding that the sentencing court in that case complied with the requirements of *Miller* by taking into account how juveniles are different from adults " 'and how those differences counsel against irrevocably sentencing them to a lifetime in prison' " (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469)).

¶ 35    We believe that this third approach is most consistent with the Court's analysis in *Miller*. We acknowledge that the factors enumerated by the South Carolina Supreme Court in *Aiken* track the language of *Miller*. Compare *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, with *Aiken*, 765 S.E.2d at 577. However, the *Miller* Court made these statements in the context of explaining "the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467. The Court explained that such sentencing schemes, "by their nature, *preclude* a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." (Emphasis added.) *Id.* at ___, 132 S. Ct. at 2467. The Court went on to describe various characteristics and circumstances that mandatory sentencing schemes "preclude[ ]" and "prevent[ ]" sentencing courts from considering. *Id.* at ___, 132 S. Ct. at 2468. In announcing its holding, however, the Court stated only that "a judge or jury must have the opportunity to consider mitigating circumstances" (*id.* at ___, 132 S. Ct. at 2475) and that its holding would "require [sentencers] to take into account how children are different, and how those differences counsel against" imposing a sentence of life without parole (*id.* at ___, 132 S. Ct. at 2469).

¶ 36    Our conclusion that *Miller* did not require sentencing courts to consider an enumerated set of factors is strengthened by the Court's recent decision in *Montgomery v. Louisiana*. That decision gave the Court an opportunity to clarify its holding in *Miller*. At issue in *Montgomery* was whether *Miller* should be applied retroactively. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at

725. In reaching the conclusion that *Miller* does apply retroactively, the Court first determined whether *Miller* announced "a new substantive rule that, under the Constitution, must be retroactive." *Id*. at ___, 136 S. Ct. at 732. In making this determination, the Court explained that its holding in *Miller* "did more than require a sentencer to consider a juvenile offender's youth." *Id*. at ___, 136 S. Ct. at 734. Rather, the Court explained, "*Miller* determined that sentencing a child to life without parole is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption." ' " *Id*. at ___, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, quoting *Roper*, 543 U.S. at 573). As such, the Court stated, its holding in *Miller* "rendered life without parole an unconstitutional penalty for" juvenile offenders whose crimes do not reflect irreparable corruption. *Id*. at ___, 136 S. Ct. at 734.

¶ 37 The *Montgomery* Court acknowledged that the holding of *Miller* "has a procedural component." *Id*. at ___, 136 S. Ct. at 734. The Court explained that this procedural component–a "hearing where 'youth and its attendant characteristics' are considered as sentencing factors"–is necessary to effectuate *Miller*'s substantive holding by enabling sentencing courts "to separate those juveniles who may be sentenced to life without parole from those who may not." *Id*. at ___, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460). The Court then discussed "the degree of procedure *Miller* mandated in order to implement its substantive guarantee." *Id*. The Court noted that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Id*. at ___, 136 S. Ct. at 735. The Court explained that it did not require such a finding because in announcing new substantive rules of constitutional law, the Court "is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." *Id*. at ___, 136 S. Ct. at 735.

¶ 38 We acknowledge that the *Montgomery* Court's statements regarding the procedure mandated by *Miller* were *dicta*. The defendant in *Montgomery* was sentenced pursuant to a mandatory sentencing scheme. *Id*. at ___, 136 S. Ct. at 726. Thus, the Court was not called upon to consider whether the procedure followed by the sentencing court was adequate to comport with the requirement of *Miller*. Nevertheless, these statements provide useful guidance in interpreting *Miller*. The *Montgomery* Court's statements regarding its intention to limit the scope of any procedural requirement lead us to conclude that the Court did not intend to require sentencing courts to make findings related to specific enumerated factors.

¶ 39 We reiterate that the *Montgomery* Court stated that the purpose of *Miller*'s procedural component is to separate those rare juvenile defendants who are incorrigible–and may therefore be sentenced to life in prison without parole–from those juvenile defendants whose crimes reflect their transient immaturity–who may not receive such a sentence. *Id*. at ___, 136 S. Ct. at 734. For the reasons that follow, we find that the procedure followed here was adequate to serve this purpose and, as such, sufficient to comply with the requirements of *Miller*.

¶ 40 As we noted earlier, the defendant's argument to the contrary focuses on the fact that the statutory factors in mitigation did not include the defendant's age or any of the mitigating circumstances associated with youth that were discussed in *Miller*. See Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-5-3.1(a). However, it is important to emphasize that pursuant to case law, sentencing courts in Illinois were not limited to consideration of the statutory factors in mitigation. As our supreme court explained in 1977, a few years before the defendant in this case was sentenced, "A reasoned judgment as to the proper sentence to be imposed must be

based upon the particular circumstances of each individual case." *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977) (citing *People v. Bolyard*, 61 Ill. 2d 583, 589 (1975)). The court further explained that this "judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, *social environment*, habits, *and age*." (Emphases added.) *Id.* (citing *People v. Dukett*, 56 Ill. 2d 432, 452 (1974)). It is also worth noting that Illinois law has long recognized a " 'marked distinction' " between juveniles and adults. *Leon Miller*, 202 Ill. 2d at 341-42 (quoting *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894)). As such, existing law required the sentencing court to look beyond the statutory factors in mitigation and consider any mitigating circumstances, including the defendant's age and social environment. The court thus had the opportunity to consider all the mitigating circumstances related to the defendant's youth, as required in *Miller*. See *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475.

¶ 41    *Miller*, however, requires not only that the sentencing court have the opportunity to consider these mitigating circumstances; it also requires that the court actually do so. See *id.* at ___, 132 S. Ct. at 2469. As the Supreme Court explained in *Montgomery*, this is necessary so that the sentencing court can determine whether the juvenile defendant is so irredeemably corrupt that a life sentence without the possibility of parole is constitutionally permissible. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734.

¶ 42    This brings us to the defendant's second argument. He argues that the sentencing court did not, in fact, consider the mitigating circumstances of his youth. In support of this contention, he points to the court's statement at the hearing that it found "no mitigating factors." We believe this argument misconstrues the court's statement. As we discussed earlier, the court stated that it had considered the statutory factors in aggravation and mitigation and found no mitigating factors. The court then went on to state that it considered the evidence in the PSI and the evidence presented at trial, as well as the arguments of counsel at the sentencing hearing. The evidence in the PSI included evidence related to the defendant's youth and the mitigating features of youth, and defense counsel argued that the court should consider the defendant's youth. Thus, we do not interpret the court's statement as an indication that the court overlooked this important evidence.

¶ 43    As we discussed earlier, the PSI revealed that the defendant had a low IQ and was susceptible to being influenced by more intelligent peers. In addition, the court was aware of the defendant's age. (We note that on the first page of the PSI, the defendant's date of birth is mistakenly listed as August 20, 1960, instead of August 20, 1961. However, his birth date is accurately reflected elsewhere in the PSI and also on the warrant for the defendant's arrest. Moreover, the prosecutor stated at the sentencing hearing that the defendant was ineligible for the death penalty only due to "an accident of birth." Thus, the court was aware that the defendant was a juvenile at the time he committed the offense.) Although it is not clear from the court's statements how much weight the court gave these mitigating factors, we presume that the court takes into account mitigating evidence that is before it. *People v. Smith*, 214 Ill. App. 3d 327, 339 (1991).

¶ 44    In this case, there was also ample aggravating evidence. The psychiatrist who evaluated the defendant concluded that the defendant was not severely impaired enough to be unable to differentiate right from wrong. It is also worth noting that the defendant turned 18 only five weeks after the murder. Thus, his age alone is less of a mitigating factor than it might be for a much younger defendant. See *Miller*, 567 U.S. at ___ n.8, 132 S. Ct. at 2469 n.8 (noting that

the holding of *Miller* would require sentencing courts to consider differences among juvenile defendants, enabling courts to distinguish between, for example, the 14-year-old defendants in *Miller* and 17-year-olds who commit "the most heinous murders" (internal quotation marks omitted)).

¶ 45    The sentencing court considered the circumstances of the crime and the evidence presented at trial. See *id.* at ___, 132 S. Ct. at 2468 (noting that the circumstances of the offense are a relevant consideration). This evidence showed that the defendant actively participated in the robbery and murder of a defenseless 83-year-old woman. See *Leon Miller*, 202 Ill. 2d at 341. Moreover, the probation officer who prepared the report found that the defendant's lack of remorse demonstrated that he had no potential to be rehabilitated. The defendant's own statement at the hearing denying that he was previously convicted of murder provided additional evidence of his lack of remorse. In addition, the PSI included the defendant's criminal record, which included three murder convictions over the course of three months as well as three juvenile delinquency adjudications, two of which were for serious felonies.

¶ 46    Defense counsel urged the court to consider the defendant's youth and fashion a sentence that offered him a chance for rehabilitation. The court expressly found that the defendant had no rehabilitative potential. In the face of all this aggravating evidence, this finding does not indicate, without more, that the court failed to consider the mitigating evidence before it. Moreover, this is precisely the determination *Miller* requires sentencing courts to make. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. We conclude that the sentencing hearing in this case comported with the requirements of *Miller*.

¶ 47    Alternatively, the defendant argues that the holding of *Miller* should be extended to require a categorical bar against even discretionary sentences of natural life in prison without the possibility of parole for crimes committed by juveniles. Before addressing the merits of this contention, we must first address the State's argument that this question is not properly before us.

¶ 48    The State argues that consideration of this question exceeds the scope of the supreme court's mandate. See *People v. Abraham*, 324 Ill. App. 3d 26, 30 (2001) (citing *People v. Craig*, 313 Ill. App. 3d 104, 106 (2000), and *People v. Bosley*, 233 Ill. App. 3d 132, 137 (1992)). We disagree. The supreme court directed us to reconsider our previous decision in light of its holding in *Davis* and "to determine if a different result is warranted." *People v. Holman*, No. 115597 (Ill. Jan. 28, 2015) (supervisory order). As discussed previously, in light of *Davis*, we found it appropriate to consider the defendant's constitutional challenge on its merits. Consideration of the defendant's challenge on its merits necessarily includes consideration of all of his related arguments. See *People v. Harris*, 388 Ill. App. 3d 1007, 1013 (2009) (rejecting a claim that the trial court exceeded the appellate court mandate by considering issues raised in amended pleadings filed after remand); *Abraham*, 324 Ill. App. 3d at 31 (explaining that "the obvious implication of [a] remand order" is for the case to "continue in an ordinary manner"). We will therefore address the defendant's argument.

¶ 49    In support of his argument, the defendant points out that the *Miller* Court explicitly declined to decide whether the eighth amendment requires a categorical bar on sentences of life without parole for any juvenile defendant. The defendants there argued that such a categorical bar was constitutionally required, at least for defendants 14 or younger. The Court found it unnecessary to consider this alternative argument. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Likewise, although the *Davis* court stated that the "special status" of juvenile

defendants recognized in *Graham* and *Miller* did not preclude a sentence of natural life without parole for all juveniles who actively participate in multiple murders, the court did not consider this question in the context of an argument for the extension of *Miller*. *Davis*, 2014 IL 115595, ¶ 45. Thus, the defendant is correct in asserting that the issue remains an open question. However, we are not persuaded by his contention that we must now expand the Court's holding.

¶ 50    We reach this conclusion for two reasons. First, as we have discussed, both *Montgomery* and *Miller* explicitly state that, in rare instances, a sentence of natural life in prison without the possibility of parole will be appropriate for juvenile defendants. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734 (noting that "life without parole could be a proportionate sentence" for the rare juvenile defendant "whose crimes reflect irreparable corruption"); *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469 (stating that its holding does not foreclose sentencing courts from determining that such a sentence is appropriate).

¶ 51    Second, Illinois courts that have remanded cases for resentencing pursuant to *Miller*–including this court and our supreme court–have consistently indicated that a natural-life sentence might still be appropriate on remand so long as the court has the discretion to consider other sentences. See *Davis*, 2014 IL 115595, ¶ 43; *Johnson*, 2013 IL App (5th) 110112, ¶ 24; *Luciano*, 2013 IL App (2d) 110792, ¶ 63; *Morfin*, 2012 IL App (1st) 103568, ¶ 59. We decline to depart from this interpretation. (We note that in *Montgomery*, the Supreme Court held that states could remedy *Miller* violations by allowing defendants serving life sentences for murders committed as juveniles to apply for parole, thereby making remand for new sentencing hearings unnecessary. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736. This does not alter our conclusion.)

¶ 52    The defendant argues, however, that the holding of *Miller* should be extended because, as he correctly asserts, eighth amendment jurisprudence evolves to reflect changing social mores and "evolving standards of decency" (internal quotation marks omitted) (*Graham*, 560 U.S. at 58; see also *Leon Miller*, 202 Ill. 2d at 339). We are not persuaded. The Supreme Court issued its decision in *Miller* less than four years ago. Its decision in *Montgomery*, which reaffirmed its reasoning in *Miller*, was issued just weeks ago. The defendant does not explain how societal standards of decency have evolved in this short time to require this court to embrace a more expansive view of what constitutes cruel and unusual punishment than the one adopted by the Supreme Court in these very recent cases.

¶ 53    For the foregoing reasons, we affirm the order of the trial court denying the defendant's petition for leave to file a successive postconviction petition.

¶ 54    Affirmed.